UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ALVIN FLORIDA, JR.,<br>ROBERT ALHASASH RASHEED,<br>JOHN LEE BERRY, III,<br>REFUGIO DIAZ, and<br>STEPHAN ALEXANDER FLORIDA,<br>Defendants. | Case No. 14-cr-00582-PJH-1<br><br>**PRETRIAL ORDER NO. 1**<br>Re: Doc. Nos. 136, 132, 146, 138 |

This matter came on for hearing on defendants' pretrial motions on June 8, 2016. For the reasons set forth on the record and summarized below, the court ORDERS as follows:

1. Defendants' motion for a bill of particulars is DENIED. Doc. no. 136. The government has provided discovery in an organized manner, and defendants seek specific categories of detailed evidence which is not required of a bill of particulars. *United States v. DiCesare*, 765 F.2d 890, 897 (9th Cir. 1985); *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979) ("there is no requirement in conspiracy cases that the government disclose even all the overt acts in furtherance of the conspiracy"). To address defendants' concern about being able to prepare for trial more effectively and efficiently in light of the voluminous discovery, the government shall disclose its trial exhibit list and witness list by **August 29, 2016**, and the government must identify all co-conspirator statements by **August 15, 2016**. As previously ordered by the court, the

parties shall file motions in limine, including objections to co-conspirator statements; pretrial statements; proposed jury instructions; and a proposed form of verdict by **August 31, 2016**. Responses to the motions in limine must be filed by **September 14, 2016**.

2.  Defendants' motion to dismiss the mail fraud counts is DENIED. Doc. no. 132. The indictment describes the alleged scheme to defraud and scheme to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and specifies the following information for each mail fraud count: (1) the individual defendants who knowingly caused the use of the mails (either United States mail or private or commercial carrier); (2) approximate date; (3) recipient; (4) sender; and (5) description of the item delivered. Indictment (doc. no. 1) ¶ 18. The indictment sufficiently contains "the elements of the charged crime in adequate detail to inform the defendant of the charge and to enable him to plead double jeopardy." *U.S. v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009) (citation omitted).

3.  Defendants' motion to adjudicate the Sherman Act count pursuant to the rule of reason is DENIED. Doc. no. 146 (amending doc. no. 134). The indictment charges defendants with a conspiracy involving an agreement not to compete at public foreclosure auctions, designating which conspirator would win selected properties at the public auction, and holding secondary private auctions to determine the conspirator who would be awarded the selected properties and to determine the payoff amounts for those agreeing not to compete. This type of conduct falls squarely within the per se category of bid-rigging, which is widely recognized as a form of price-fixing, which is "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5 (1958).

Defendants cite *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1154-55 (9th Cir. 2003), where the court noted that it was appropriate to apply the rule of reason "because plausible arguments that a practice is procompetitive make us unable to conclude 'the likelihood of anticompetitive effects is clear and the possibility of

1  countervailing procompetitive effects is remote.'" *Id.* at 1155 n.8 (quoting *Northwest*
2  *Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 294
3  (1985)).  Neither *Paladin* nor *Northwest Wholesale Stationers* (both civil cases involving
4  private litigants) involved an anticompetitive agreement that fell squarely within a per se
5  category, and neither case stands for the proposition that defendants may offer plausible
6  arguments in support of a rule of reason analysis to a category of economic activity that
7  merits per se invalidation under Section 1 of the Sherman Act.  *See Northwest Wholesale*
8  *Stationers,* 472 U.S. at 293, 295-96 (distinguishing the wholesale cooperative at issue
9  from group boycotts subject to per se treatment, where the case "turns on . . .  whether
10 the decision to expel Pacific is properly viewed as a group boycott or concerted refusal to
11 deal mandating per se invalidation"); *Paladin,* 328 F.3d at 1154-55 ("even if Northridge
12 and MPC are, in a sense, competitors, the type of agreement at issue here cannot be
13 considered one that will 'always or almost always tend to restrict competition.'") (quoting
14 *Northwest Wholesale Stationers*, 472 U.S. at 289).  The court declines defendants'
15 invitation to carve out an exception from the per se rule that applies to bid-rigging simply
16 because it took place during a recession or in the wake of a housing bubble, given the
17 weight of authority recognizing bid-rigging as a category of anticompetitive conduct
18 subject to per se treatment.  *U.S. v. Green*, 592 F.3d 1057, 1068 (9th Cir. 2010)
19 (affirming CR 05-208 WHA (N.D. Cal.)); *U.S. v. Romer*, 148 F.3d 359 (4th Cir. 1998);
20 *U.S. v. Koppers Co., Inc.*, 652 F.2d 290, 295 (2d Cir. 1981).

21 By contrast to *Paladin* and *Northwest Wholesale Stationers*, where the courts
22 considered whether the alleged conduct fit into the per se category of group boycotts, an
23 alleged agreement not to compete at a public auction, to designate the winner at the
24 public auction, and to negotiate payoffs for agreeing not to compete is the kind of
25 agreement that courts have deemed to be unlawful under Section 1 of the Sherman Act,
26 as recognized by the antitrust bar:

27 > The indictment charges the defendants with conspiring to rig
28 > the results of an auction.  An auction-rigging conspiracy is an
>  agreement between two or more persons to eliminate, reduce

> or interfere with competition for a product, job or contract that is to be awarded on the basis of auction bids. In this case, defendants have been charged with conspiring to rig the results of the [auction title or description] by deciding in advance which of them should be the successful bidder on particular items.

ABA MODEL JURY INSTRUCTIONS IN CRIMINAL ANTITRUST CASES at 62-63 (2009)). As the government points out, the per se rule has been consistently applied in prosecutions for bid-rigging in the context of public foreclosure auctions, though admittedly the defendants in those cases did not litigate the application of the per se rule. *U.S. v. Romer*, 148 F.3d 359 (4th Cir. 1998); *U.S. v. Guthrie*, 814 F. Supp. 942 (E.D. Wash. 1993), *aff'd*, 17 F.3d 397 (9th Cir. 1994) (unpublished); *U.S. v. Katakis*, CR 11-511 WBS (E.D. Cal. March 11, 2014).

Even if the reasoning of *Paladin* could be extended to a per se bid-rigging prosecution, the court is not persuaded that defendants have offered "plausible arguments" about the procompetitive effects of their agreement that would warrant analysis under the rule of reason. Defendants argue that they were competing in a unique market, where the banks effectively dominated the market for foreclosed properties and set their own price as buyers by determining the opening bid as sellers at the public auction. This "unique position" of the banks is not unique to the time period charged in the indictment. As recognized by the consultant to the defendants in *U.S. v. Marr,* CR 14-580, cited by defendants here, "In public foreclosure auctions, the mortgage holder sets the opening bid amount. . . . If a third party does not bid higher than the opening bid, then the bank retains the property and is able to resell it in the open market." Andrien Decl. (doc. no. 146-1) ¶ 16. The fact that defendants are charged with an agreement not to compete during a time when there was a glut of foreclosures does not render their anticompetitive agreement subject to a "plausible argument" that their arrangement was "intended to enhance overall efficiency and make markets more competitive." *Northwest Wholesale Stationers,* 472 U.S. at 294, 296 (recognizing that wholesale purchasing cooperatives "are not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects" and that "[t]he act of expulsion

4

1  from a wholesale cooperative does not necessarily imply anticompetitive animus and
2  thereby raise a probability of anticompetitive effect").

3  Defendants have not demonstrated that the housing foreclosure market was
4  exceptional in any way other than the volume of properties available, and acknowledged
5  at the motion hearing that defendants were not precluded from competing in the open
6  market.  *See U.S. v. Alston*, 974 F.2d 1206, 1209 (9th Cir. 1992) (rejecting argument that
7  that the agreement among dentists on higher co-payment fees to be paid by prepaid
8  dental plans should have been analyzed under the rule of reason, holding that the health
9  care market was not an exceptional market in which horizontal restraints on competition
10  were necessary to make the product available on the market at all).  Defendants were not
11  prevented from entering the market without an agreement not to compete; defendants
12  could have openly competed in the public foreclosure auctions against the banks and
13  other competitors, including co-conspirators.  The Sherman Act violation charged in the
14  indictment alleges an agreement among competitors not to compete against each other
15  at auction, a bid-rigging arrangement mandating per se treatment because "the likelihood
16  of anticompetitive effects is clear and the possibility of countervailing procompetitive
17  effects is remote."  *Northwest Wholesale Stationers*, 472 U.S. at 294.  "This principle of
18  per se unreasonableness not only makes the type of restraints which are proscribed by
19  the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the
20  necessity for an incredibly complicated and prolonged economic investigation into the
21  entire history of the industry involved, as well as related industries, in an effort to
22  determine at large whether a particular restraint has been unreasonable—an inquiry so
23  often wholly fruitless when undertaken."  *Northern Pac. Ry.*, 356 U.S. at 5.

24  4. Defendants' motion to reserve leave to file additional motions is DENIED.
25  Doc. no. 138.

26  5. The government's motion to strike defendants' late-filed declarations in
27  support of their motion to suppress is DENIED.  Doc. no. 172.  Defendants conceded at
28  the hearing that they do not seek suppression of the video portion of the warrantless

5

1 recordings. The court has received a supplemental brief by the government and audio
2 recordings. The court overrules the government's objection to the late-filed declaration
3 by Stephan Florida. After reviewing the supplemental filings, the court will determine
4 whether to set a further hearing on the motion to suppress. Doc. no. 141. The court
5 notes that defendants have not timely filed a supplemental brief specifying their requests
6 for information about how the recordings of their communications were used by the
7 government and/or law enforcement, after having been granted leave to do so.

**IT IS SO ORDERED.**

Dated: June 21, 2016

_____
PHYLLIS J. HAMILTON
United States District Judge